Dureee, Judge,
delivered the opinion of the court:
A war-caused housing shortage, an enterprising promoter, risky investment, and a sudden housing surplus, woven together to form a $325,000 business loss, constitute the major elements leading up to this suit for breach of an implied contract.[1] There is no doubt that the loss occurred; the sole question before the court pertains to defendant’s liability.
The story of this controversy began on August 91, 1950-, shortly after the outbreak of the Korean War. On that date the Department of the Army reactivated Camp Roberts, California, a former World War II Army .training camp located near San Miguel. Shortly after the reopening, the Army moved in a large number of troops for -training and subsequent trans-shipment to the Korean theater. As a result of the large influx of troops -there soon developed a critical shortage of housing for military personnel and their dependents in the nearby vicinity. Housing was especially needed for the permanent cadre of instructors. Camp Roberts was designated as a temporary military installation, and thus was ineligible for assistance in home construction under the Wherry Housing Act.[2] The housing shortage continued during the remainder of 1950 and through 1951. Housing conditions for the troops and their dependents were very bad with every available kind of structure being used *996 for rental housing, and all of it being subject to extremely high rentals.
Sometime in mid-1951 a Mr. Burt B. Mold became acquainted with the critical housing shortage, and became interested in furnishing housing for troops in the Camp Roberts area as a private enterprise matter. In this connection, Mr. Mold organized a firm to be known as Edward Biaggini & Associates. The firm, financed by local investors, was to develop a housing project for the Camp Roberts area. Sometime in July of 1951, Mr. Mold learned of the existence of 976 Government-owned temporary portable housing units located at Wilmington, California. The units were prefabricated one and two-bedroom homes which were vacant under an order of the Housing and Home Finance Agency (HHFA) which suspended all sales or disposition of portable family dwelling units and other housing owned by the United States, pending a determination of their need for defense purposes during the Korean War.
Upon learning of the suspense or “freeze” order on these portable dwelling units, Mold began a campaign to obtain the release of the houses for sale to private enterprise for use at Camp Roberts. The Commanding Officer of Camp Roberts was contacted, and letters were written by Mold to the President of the United States, the Secretary of the Army, officials of the Public Housing Administration (PHA), HHFA, and senators and congressmen from California. As a result of Mold’s urgent and vigorous activities, the HHFA and the PHA decided in December, 1951, that 500 of the units would be released for sale, and that the PHA would place the units on sale to the highest bidder, subject to removing the units and relocating them in the vicinity of Camp Roberts and making said units available for rental to personnel of the camp. A press notice to this effect was released on January 14,1952.
The invitation for bids was then prepared. Pertinent parts of the invitation provided that the sale was “as is” and “where is”; that the property was to be removed at the purchaser’s expense; that PHA made no warranties either express or implied with respect to the property, except a warranty of title; that the houses were to be moved near to Camp Roberts, *997 and were to be made available for a period of five years for rental to the camp personnel, unless the Commanding Officer determined the need for bousing no longer existed; that the purchaser covenanted he had a site available for the relocation of the units.[3]
Thereafter, a bid was submitted by Amercal Corporation, successor in interest to the Mold group,[4] and by two other groups. All bids were rejected by PHA. In the meantime, Mold had interested another group of investors in the venture. Mr. Plarvey Silbert, an attorney, was spokesman for the new group. Mold acquainted Silbert with the Camp Roberts situation, but never showed Silbert any tangible evidence that would indicate Camp Roberts was a permanent installation. Mold, in fact, apparently never believed Camp Roberts to be anything other than a temporary camp, as evidenced by the aforesaid earlier letters from Mold to the President and the California congressmen and senators. Those letters in part had stated:
Most construction companies refuse to build because of the risk involved in the construction of temporary housing. I have heard many construction executives state that they would build permanent housing if they were assured that Camp Roberts would become a permanent fort. That, of course, is far-fetched and questionable, although making Camp Roberts a permanent fort would be a move in the right direction. Everyone out here agrees to that.
In any event, however, Silbert did not evidence any substantial concern with the length of active occupancy of the camp and decided to go forward with the venture.
At a meeting in April, 1952 in the office of the Regional Director of PHA, Mold and Silbert agreed to purchase one-half of the 500 units for $112,000 with an option on the remaining one-half. At the meeting there was no representative of the Department of the Army present, and throughout the meeting there was no discussion as to the length of occupancy of Camp Roberts. Nor did Silbert make any inquiries as to the permanency of the camp. Thereafter, *998 drafting of tbe formal contract was turned over to tbe Chief Legal Officer of tbe Regional Office of PHA. Tbe formal contract, as signed by Silbert on May 15,1952 for tbe present plaintiffs,[5] contained tbe following crucial clause:
(7) Tbe Purchaser shall, not later than 200 calendar days, [sic] from tbe date tbe Purchaser receives title to tbe Property from tbe Seller, transport the Property and make all of tbe said 250 dwelling units ready and available for rental on the site described in paragraph 6-bereof. Tbe Purchaser shall make said 250 units available for rental for a period of five years to tbe military and civilian personnel of Camp Roberts. In the event that during tbe aforesaid five-year period (which shall be construed to commence on tbe date on which all of the 250 dwelling units are made available for occupancy) the Commanding Officer of Camp Roberts determines that a need for any number of such housing units no longer exists, the requirements of this paragraph will not apply to any dwelling units in excess of the number determined to be needed by a written finding of the Commanding-Officer. Subject to the provisions of the preceding sentence, when any vacancy occurs after a dwelling unit has been occupied by military or civilian personnel of Camp Roberts, the Purchaser will hold such dwelling unit for the exclusive use of the military and civilian personnel of Camp Roberts for a period of 30 calendar-days.
Also included was a disclaimer of warranty clause which stated:
(1) The Property is sold “as is” and “where is.” The Seller makes no warranty, either express or implied, with respect to the Property except the Seller warrants it has the right to transfer title to the Property. The-Seller’s liability under this paragraph shall not exceed the amount of the purchase price.
Following execution of the contract, the contractor commenced moving 250 houses from Wilmington, California to. San Miguel, California. The first of the houses arrived at San Miguel on May 29, 1952, having been moved on truck beds without being disassembled. By August 20, 1952, 204' of the houses had been relocated at the Camp Roberts area. *999 The bouses were repaired, and generally rehabilitated and. shortly thereafter were opened for occupancy.
Sometime after execution of the contract, and prior to October 22, 1952, the time for exercising the option on the-second group of houses, Silbert and two of the large investors, in the project visited Camp Roberts to ascertain the continued need for housing at the camp. Everyone concerned, with the transaction at this point knew the camp had been used during World War II, and thereafter placed in a. standby or inactive status. They also knew that the action in Korea was the cause of reactivation. In the opinion of’ a camp colonel, however, the investment seemed a sound one. Silbert understood this statement to be mere opinion. The other two large investors believed that no one could tell how long the post might stay open, and that this information-could not be ascertained because it depended on the length, of the Korean War. It should be noted that no representative of the Contracting Officer was present during this visit,, and at no time did any representative of the Contracting-Officer make or was ashed to make any representation as to-the permanence of the camp. The option to purchase the-Second group of houses was thereafter exercised; and the-houses were moved on April 1, 1953.
The obvious conclusion to the aforesaid transaction needs-little elaboration. Camp Roberts was deactivated shortly thereafter (November, 1953). With the inactivation of Camp Roberts, the source of tenants vanished for the 500 houses which plaintiffs had moved and rehabilitated for occupancy by military personnel. As a result, plaintiffs’ losses-amounted to at least $325,661.76. Plaintiffs now seek to-recover these losses.
. Plaintiffs have conjectured an implied contract theory as-a basis for their recovery. In support of this theory, plaintiffs place much emphasis on the case of Padbloc Company, Inc. v. United States, 161 Ct. Cl. 369 (1963). The court in» Padbloc, supra, using contemporary rules of contract law;, viewed the -totality of a factual situation and found an agreement by implied promise which formed the basis of a contract. The result was reached by snipping the superficial' bonds of a unilateral offer contention by defendant, andl *1000 delving into the actual intricacies of the parties’ obligations as evidenced by their actions and supporting documents.
Plaintiffs believe that here, as in Padbloc, supra, an implied promise on the part of defendant exists and has been violated. The gist of the contention is that, coupled with the execution of the original contract and the option, which acted to guarantee housing at Camp Roberts for a five-year period, was a reciprocal obligation on defendant’s part to maintain Camp Roberts in active status for the five-year period. This contention stems from plaintiffs’ thesis that it would be inconceivable that plaintiffs, businessmen interested in realizing a profit on their investment, would have committed themselves to the large outlay of cash or have entered into the project at all, if they had thought the Government had not guaranteed use of the housing for the five-year period.
Looking back on the previously stated facts, we find it difficult to put much credence in plaintiffs’ allegations of implied contract. The original bid invitation gives us the first indication that such a promise on defendant’s part did not exist. The invitation contained a specific disclaimer that no warranties were made with respect to the property. Further, specific mention was made of plaintiffs’ obligation to make the houses available for a five-year period, yet no mention was made of any obligation by defendant to keep the camp operable for five years. Quite to the contrary, the plain, clear language of the invitation gave the Commanding Officer of the camp the right to make a determination at any time that the housing was no longer needed. This language flies in the face of plaintiffs’ argument. While it is true that the contract was not awarded on the basis of the invitation, and also that most of the present plaintiffs were not involved in this venture at the time of the invitation, the original promoter, Mr. Mold, one of the present plaintiffs, and one of the negotiators for all present plaintiffs, had clear knowledge of the invitation.
Even if Mold’s knowledge of the contents of the bid could not be imputed to all of the present plaintiffs, Clauses 1 and 7, supra, of the negotiated contract are binding on them. These clauses contain the same restrictions and obligations *1001 of the just-mentioned invitation, i.e., a specific disclaimer of any warranty express or implied, and a right of the Commanding Officer to determine at any time during the five-year period that the need for the housing no longer existed.[6]
Further proof, if needed, that neither party recognized any promise by defendant, can be shown by Mold’s letter to the President, and California senators and congressmen in regard to the permanency of the camp, in which Mold termed such permanency “farfetched and questionable.” Also, no inquiries were made by Silbert and Mold at the time of the negotiation as to the permanency of the camp. Even when this question of permanency finally did arise at the time of the exercise of the option for the 250 additional units, the investors never asked the Contracting Officer to make any representation as to the permanency of the camp. The investor plaintiffs realized that the ascertainment of permanency depended upon an unknown factor — the length of the Korean War.
Not only does plaintiffs’ case fall on the facts, but the applicable case law- — notably Henry Barracks Housing Corporation v. United States, 150 Ct. Cl. 689, 281 F. 2d 196 (1960), is contrary to their position. Plaintiff in Henry Barracks, supra, was the operator of a Wherry Housing project. Shortly after construction of the project, the military' post was deactivated. Plaintiff brought suit for breach of contract on the ground of express and implied promise that the camp would not be deactivated.[7] Plaintiff’s position in Henry Barracks was stronger than the present plaintiffs’, for in Henry Barracks, the Secretary of the Army .had issued a certificate of need to FHA which stated in part, “there is no present intention to substantially curtail the activities at such installation.” Nevertheless, the court found that such a certificate was neither a warranty nor guarantee, and that no breach occurred. The court stated at p. 695:
* * * No responsible representative of the Defense Department could intelligently have said that an installation was permanent and that the activities would not *1002 be curtailed. Such assurances simply could not be given. * * *
and later, at p. 699:
* * * The contractor must have been aware, also, of the inability of the Government, or any government, to guarantee that defense needs are immutable. * * *
Here, as in Henry Barracks, the exigencies of a flexible defense policy precluded the possibility of any Government-made promises that the defense installation would be kept open a certain period of time. Such promises just could not be given.
The investors in this suit entered into these transactions with the objective in view of obtaining a return on their investment. After the erection of the houses at Gamp Roberts, the unknown factor bearing upon the possibility of a profit to plaintiffs was the length of the Korean War. This was a risk of investment which plaintiffs accepted after careful consideration of the factors involved. Plaintiffs are not entitled to recover. The petition is dismissed.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. On August 9, 1950, shortly after the outbreak of the Korean War, the Department of the Army reactivated Camp Roberts, California, a former World War II Army training camp. Camp Roberts is located near the Pacific Coast in San Luis Obispo County, California, approximately midway between San Francisco and Los Angeles. In the nearby vicinity are a number of small communities, principally San Miguel, four miles distant (pop. 600), Paso Robles, 13 miles away (pop. 4821), and San Luis Obispo, 49 miles from the camp (pop. 14,162).
2. Shortly after the reopening, the Army moved in a large number of troops (approximately 17,000) for training and subsequent trans-shipment to the Korean theater. As a result of the large influx of troops there soon developed a critical shortage of housing for military personnel and their dependents in the nearby vicinity. Housing was needed for *1003 the permanent cadre of instructors, etc.; the trainees who remained only for a short training period before leaving for Korea were housed on the Camp premises. Camp Roberts was designated as a temporary military installation and thus was ineligible for assistance in home construction under the Wherry Housing Act. The Army, however, did make several requests of the Federal Housing Administration (FHA) to institute a housing program in the Camp Roberts area but this effort to obtain housing was not successful.
3. By the end of 1950 the housing situation had become very critical, and the Commanding Officer of Camp Roberts, Colonel Butner, indicated to the Commanding General of the Sixth Army at the Presidio in San Francisco that there was a minimum need for 600 temporary family housing units. Shortly after this General Frank H. Partridge became the Commanding Officer at Camp Roberts and remained such until January 1, 1953. Serving under him as Deputy Commander was Colonel Robert I. Stack.
4. One of Colonel Stack’s responsibilities as Deputy Commander was to assist personnel in locating and obtaining housing in and about the vicinity of Camp Roberts. In connection with his efforts to obtain adequate housing for the troops and their families, Colonel Stack, on a number of occasions discussed the need for adequate housing with various local officials and citizens in the towns adjacent to Camp Roberts. In furtherance of his general responsibilities, Colonel Stack also made occasional speeches in the nearby towns discussing the inadequacy of housing in the immediate area and calling upon the communities for aid and assistance in providing adequate housing for the military and their dependents. On a few occasions during those speeches, Colonel Stack was asked if Camp Roberts would be made into a permanent “fort”. His response to this question was that only an act of Congress could make Camp Roberts into a “fort” and that the permanency of the camp was dependent on appropriations made by Congress. Colonel Stack also made the statement that neither he nor anyone else could guarantee how long Camp Roberts might be kept open.
*1004 5. The evidence of record shows that the speeches and statements made by Colonel Stack during this time were not heard by any of the persons who later became investors in the Amercal Development and Investment Corporation or the Almond Acres Housing Project, the plaintiff herein.
6. The housing shortage in the Camp Boberts area continued during the remainder of 1950 and through 1951. Housing conditions for the troops and their dependents were very bad with every available kind of structure being used for rental housing and all of it being subject to extremely high rentals. Subsequently, rent control was instituted in the P.aso Bobles-Camp Boberts area.
7. Sometime in approximately mid-1951 a Burt B. Mold of Burt Burton & Associates became acquainted with the critical housing shortage in the Camp Boberts area through a discussion had with a local resident, Mr. Edward Biaggini. Subsequently Mr. Mold had further discussions with Mr. Biaggini’s father, a wealthy rancher in the Paso Bobles area. As a. result of these conversations, Mr. Mold became interested in furnishing housing for troops in the Camp Boberts area as a private enterprise matter.
8. In this connection Mr. Mold had a number of discussions and corresponded with Mr. George Stephan, Executive Director of the Housing Authority of the City of Paso Bobles. Mr. Mold proposed that a housing project be developed, sponsored by a firm organized by Mr. Mold to be known as the Edward Biaggini & Associates and to be financed by Mr. Biaggini and other local investors.
9. While engaged in the plans for this venture, some time around July 16, 1951, Mr. Mold’s attention became focused on the existence of 976 Government-owned, temporary portable housing units known as Western Terrace, Cal-4877, which were located at Wilmington, California. These units were temporary, prefabricated, portable one- and two-bedroom homes with inside toilet and shower facilities, which had previously been erected on land leased to the Los Angeles City Housing Authority for the purpose of housing defense shipyard workers in the nearby Wilmington Shipyards. At this time the houses were under the custody of the Los Angeles Housing Authority which was acting as custodian *1005 for the Federal Public Housing Administration (PHA), the agency which had the ultimate authority and control over the houses. At this time, and since July 1950 the PHA had been instructed by the Housing and Home Finance Agency of the United States (HHFA) to suspend all sales or disposition of portable family dwelling units and other housing owned by the United States, pending a determination of their need for defense purposes during the Korean war.
10. Upon learning of the suspense or “freeze” order on these portable dwelling units, Mr. Mold began a campaign to obtain the release of the houses for sale to private enterprise for use at Camp Koberts. The existence of .the Wilmington Terrace temporary houses was brought to the attention of General Partridge, Commanding Officer of Camp Koberts, and as a result thereof, General Partridge wrote to the Commanding Officer of the Sixth Army, requesting that the matter of releasing the houses be taken up with the Administrators of the HHFA and PHA with a view to making the units available for sale to private enterprise for the sole purpose of providing housing for military personnel in the Camp Koberts area. In this communication, General Partridge advised the Commanding Officer that “I have been further informed that a contracting firm (Biaggini Associates) is interested in the purchase of these excess units for the purpose of constructing temporary housing in the Camp Koberts-Paso Kobles area.”
11. On August 6,1951, Burt Mold addressed long (5-page, single-spaced) letters to the President of the United States, the Secretary of the Army, officials of PHA, the Administrator of the Housing and Home Finance Agency and all Senators and Congressmen from California in which he called their attention to the critical housing situation in the area of Camp Koberts. He also informed them that he was associated with a group which desired to do something about the matter by moving some 976 housing units then located near Wilmington, California, to the Camp Koberts area on sites for which the group was then negotiating and making them available to the military at Camp Koberts at low rentals. The letters called upon all addressees to help to *1006 cut the red tape which the writer felt was standing in the way of the group’s acquisition of the houses.
12. Some time around the beginning of August 1951 the organization associated with Mr. Mold, Biaggini-Burton Associates, completed negotiations for the adquisition of 21 acres of land in San Miguel, California.
13. Throughout the period from August 1951 to mid-December 1951, Mr. Mold continued to make vigorous efforts to obtain the release of the temporary houses, addressing letters to Mr. Herman, the Regional Housing Expediter of the PHA; Mr. Melville, the Regional Director of PPIA, and Mr. Egan, Commissioner of PHA; Raymond Foley, the Commissioner of HHFA and to various members of the military. Similarly, various officials of the Army, including General Partridge and Frank Pace, the Secretary of the Army, wrote to the housing agencies, PHA and HHFA, requesting the release of the houses and negotiating their sale to the Mold group.
14. As a result of Mr. Mold’s urgent and vigorous activities, the PHA and the HHFA on or about December 14,1951 decided that 500 of the 976 Western Terrace dwelling units would be released for sale and that PHA would place the units on sale to the highest bidder, subject to removing the units and relocating them in the vicinity of Camp Roberts and making said units available for rental to personnel of the Camp.
15. During the latter part of December 1951 the San Francisco office of PHA, pursuant to instructions from Washington, made a detailed appraisal of the houses at Wilmington, California. The appraisal made established a total value for the 500 portable houses of $224,000 or approximately $500 per house.
16. In a press release dated January 14, 1952 the PHA announced that it was offering for sale 500 temporary housing units on the condition that they be removed and relocated in the Camp Roberts area to serve the critical housing needs of the military and civilian personnel. Said announcement indicated that bids would be opened at 8 PM March 14. Shortly thereafter, notice of the sale appeared in a number of California newspapers.
*1007 17. Among the sales conditions attached to the invitation for bids were the following:
* * * * *
2. The property is sold “As is” and “Where is”. The property must be removed at the Purchaser’s expense within 120 days from the date of the award * * *
<: * * * *
4. Public Housing Administration makes no warranty, either express or implied, with respect to the property except Public Housing Administration warrants it has the right to transfer title to the property. Public Housing Administration’s liability under this paragraph shall not exceed the amount of the purchase price. Further the Purchaser understands that in relocating the property described herein, he must comply with all laws and local ordinances which may be applicable and will secure and pay for all applicable licenses and permits.
5. The Purchaser will remove the 500 one-story portable family dwelling units from its present site to a site within a five-mile radius of San Miguel, California, for the purpose of providing rental housing in the critical housing defense area of Camp Roberts, California, and the Purchaser shall first make such housing units available for rental to the military and civilian personnel attached to Camp Roberts, California.
6. The Purchaser shall, within 200 days from the acceptance of this Contract by Public Housing Administration, make available all of said 500 dwelling units for a period of five years for rental to the military and civilian personnel of Camp Roberts, unless at any time within the five-year period the Commanding Officer of Camp Roberts determines the need for such housing no longer exists. In this event the restriction regarding the rental of said 500 dwelling units shall not apply.
7. The Purchaser covenants that he has a site available for the relocation of said 500 one-story portable family dwelling units within a five-mile radius of San Miguel, California. Said site is either owned by the Purchaser in fee simple, or the Purchaser has a valid five-year lease or five-year permit on said site, or the Purchaser can submit binding written evidence of control of a satisfactory site for five years. The Purchaser will make available to the Public Housing Administration such evidence of title or lease or. permit if so requested by the Public Housing Administration.
*1008 8. When, any vacancy occurs after a dwelling unit has been initially occupied by military or civilian personnel of Camp Roberts, the Purchaser will hold such dwelling units for the exclusive use of the military and civilian personnel of Camp • Roberts for a period of thirty days.
18. By Addendum No. 1, dated February 4, 1952, the date for opening the bids was advanced to March 3, 1952.
19. On January 1, 1952, prior to the submission of any bid by the Mold Group, Mr. Edward Biaggini wrote to Mr. Jack Melville, Regional Director PHA, that he was no longer interested in participating in the proposed housing project. On February 1, 1952 there was filed in California “Articles of Incorporation” for Amercal Development and Investment Corporation. The investors in this group were prominent people who, in the main, were from the localities surrounding Camp Roberts, although there were also several from Los Angeles. On February 11, 1952 the corporation entered into a General Manager’s Agreement with Burt B. Mold. However, shortly thereafter the Division of Corporations for the State of California objected to the participation of Burt B. Mold and on February 27, 1952 he resigned as General Manager. On March 1, 1952 the corporation voted to issue 50,000 shares of stock to Burt B. Mold for promotional services, and shortly thereafter Burt B. Mold waived any and all rights against Amercal.
20. On February 28, 1952 Amercal, by its secretary, Jack W. Hardy, submitted a bid for 500 houses for $125,000 cash or, in the alternative for $200,000 with deferred payments. At the bid opening on March 3,1952 it was ascertained that in addition to Amercal’s bid there were only two other bids, one for $10 and the other was non-responsive. Shortly thereafter the Regional Director of PPIA analyzed the bids and recommended to the Washington office of PHA that all bids be rejected. In reply to this recommendation on April 1, 1952 the Regional Director of PHA was instructed to reject all bids. At the same time instructions authorized the Regional Director to negotiate with Amercal for the acquisition of the 500 units on a negotiated basis. Plaintiff was advised of the rejection of the bid on April 3,1952.
21. Some time shortly after March 3, 1952 and before *1009 April 3, 1952 the original stockholders and directors of Amercal indicated that they would no longer participate in the proposed housing venture. At this time Burt Mold contacted a Los Angeles lawyer, Mr. Harvey Silbert, with regard to obtaining a new group of investors. Mr. Silbert represented men of means who were interested in real estate ventures. At this time Amercal had submitted its bid to PHA but the bid had not yet been rejected. Mold wanted Silbert to obtain private money to finance the contract if the bid were accepted. In his efforts to induce Silbert to aid the venture Mold acquainted Silbert with the need for housing at Camp Roberts and the then-existing bid. Mold also showed Silbert letters addressed to him on Army or PHA stationery which he had received from the Government, but Mold did not show Silbert any of the letters he had written to various governmental people. For example, Mr. Silbert was not shown any of the letters addressed to the President or to the two California Senators or the Congressmen, which contained the following statement:
Most construction companies refuse to build because of the risk involved in the construction of temporary housing. I have heard many construction executives state that they would build permanent housing if they Avere assured that Camp Roberts would become a permanent fort. That, of course, is far-fetched and questionable, although making Camp Roberts a permanent fort would be a move in the right direction. Everyone out here agrees to that.
In none of the correspondence shown to Mr. Silbert by Mr. Mold was there any indication that Camp Roberts was a permanent Army installation.
22. Some time during this period Mr. Silbert went to Wilmington, California to view the houses concerned. At that time the houses were in a fenced area which was locked but he could view the houses from the road. Mr. Silbert then went with Mr. Mold to the Camp Roberts area. There he met James A. Madden, the City Attorney of Paso Robles and Chairman of the Sixth Army Advisory Committee. Mr. Silbert understood Mr. Madden to be a “lay advisor to the officials at Camp Roberts in some capacity.” Silbert also met Mr. George Stephan, Executive Director of the Housing *1010 Authority for the City of Paso Eobles and Secretary of the Sixth Army Advisory Committee. In addition, Mr. Silbert visited Camp Roberts itself and spent several hours at the Camp. During this visit to the Camp, Mr. Silbert was shown the various facilities at the Camp, including a large swimming pool, a theater, a dining room, a store, and other public facilities. All of these appeared to him to be permanent and expensive. At the same time Mr. Silbert met Colonel Stack who told him of the acute need for family housing in the area.
23. The foregoing was the only visit to Camp Roberts made by Mr. Silbert prior to April 9, 1952. At this time, Mr. Silbert was not terribly concerned with the length of the permanency of the Camp. Nor was Mr. Silbert aware of a distinction between the meaning of the terms “camp” and “fort” or that such distinction might indicate a difference in the permanency of an Army installation.. Generally speaking, “camp” denotes a temporary installation, whereas a “fort” is an installation authorized by Congress which is considered to be permanent. This distinction, however, is ai relative one since a fort as well as a camp |may be deactivated or closed at any time. It was at about this time that Mr. Silbert decided to go forward in the venture. Other investors in the group which subsequently became the plaintiffs herein, relied upon Mr. Silbert’s discretion in the transaction.
24. Shortly before April 7, 1952 Amercal offered to purchase 250 houses for $95,000 and on April 7, 1952 this offer was also rejected by PHA.
25. On April 9, 1952, a meeting was held in the office of Mr. Jack Melville, Regional Director of PHA. Also present at the meeting were Mr. Madden, Mr. Stephan, Mr. Burt Mold and Mr. Harvey Silbert, as representative of the investing group. At this meeting the rejection of the two previous bids of Amercal was discussed. Mr. Melville also advised the group that the Government’s appraisal of the 500 houses was in the amount of $224,000. The suggestion was also made by Mr. Melville that the Silbert group buy one-half of the units at $112,000 with an option to purchase the remaining one-half at the same price 150 days later. At said *1011 meeting agreement was reached with regard to the foregoing terms, subject to approval by Mr. Melville’s superiors. On the same day Mr. Melville obtained telephonic approval from the Commissioner of Public Housing in Washington. This was followed by written authorization on April 14, 1952. This approval covered the basic terms relating to price, i.e., sale of 250 units for $112,000 together with an option to buy the remaining 250 units at the same price not more than 150 days later. Drafting of the formal contract embodying all of the terms agreed upon was turned over to the chief legal officer of the Regional Office of PHA.
26. At the foregoing meeting there was no representative of the Department of the Army present and throughout the meeting there was no discussion as to the permanency of Camp Roberts. Mr. Silbert did not make any inquiry or consult with Mr. Melville or any other housing officials regarding the permanency of Camp Roberts. He believed that this was a subject outside of their jurisdiction.
27. On May 14,1952 the formal contract was sent by PHA to Mr. Silbert for signature. On the following day the contract was signed on behalf of Amercal and returned to PHA. At that time the stockholders of Amercal were Bernard Silbert, Myer Gensburg, David Gensburg, Victor Carter, A. M. Gross, Isabelle Welsch, Harry Berlin, John J. Bums, Harold B. Garfield, Harold B. Garfield and Marvin Garfield d/b/a Garfield Pharmacy, Philip Cravitz, David Sherman, Herbert Glaser, David Diamond, and Harvey L. Silbert. Subsequently Jack Barenfeld, Charles Barenfeld and Samuel Glaser also became stockholders in the corporation. On December 12,1952 all of the stockholders of Amer-cal voted to dissolve the corporation and operate as a partnership d/b/a Almond Acres Housing Project.
28. The contract, designated as Contract (CAL-4877-SF) d-1834-P, contained the following pertinent provisions:
CONTRACT EOE SALE, REMOVAL AND RELOCATION OP 250 ONE-STORT PORTABLE PAMILV DWELLING. UNITS AND ADDITIONAL OPTION.
For and in consideration of $121,717.05, the United States of America, acting by and through the Housing *1012 and Home Finance Agency, Public Housing Administration (herein called the “Seller”), does hereby:
(A) Transfer and sell (subject to the conditions set forth below) unto the Amercal Development and Investment Corporation, a California corporation, of 6399 Wilshire Boulevard, Los Angeles, 48, California (herein called the “Purchaser”), 250 one-story family dwelling units together with the equipment and , furniture presently situated therein (hereinafter called the “Property”) now located with Housing Project No. CAL-4877, westerN terrace, San Pedro, California, said Property being identified in Exhibit “A” attached hereto and made a part hereof, and
(B) Grant unto Purchaser an option as set forth in paragraph 13 below.
This transfer, sale and option is made upon the following conditions:
(1) The Property is sold “ás is” and “where is”. The Seller makes no warranty, either express or implied, with respect to the Property except the Seller warrants it has the right- to transfer title to the Property. The Seller’s liability under this paragraph shall not exceed the amount of the purchase price.
* * * * *
(3) The Purchaser will deliver to the Seller its certified check for $121,717.05 in full payment of the purchase price of the Property and will execute and deliver to the Seller a Performance Bond in the amount of $100,000.00, satisfactory in form and substance to the Seller, both on or before May 23, 1952. Such Performance Bond will assure the faithful performance on the part of the Purchaser of the following provisions of this contract:
A. Paragraph4 (a), (b), (c), (d) and (e)
B. The first sentence of paragraph 7
C. All of paragraph 8
The Seller agrees to dispatch to the Purchaser its written notification of approval or disapproval of the Performance Bond within seven days of its receipt by the Seller. In the event the submitted bond is disapproved, the Seller agrees to set forth in the notice the reason for the disapproval.
Title to the Property shall pass to the Purchaser on the date of the letter dispatched by the Seller to the Purchaser which letter indicates the Seller’s satisfaction with the Performance Bond submitted.
*1013 (4) The Purchaser shall furnish all labor and material, perform all work, and assume all expenses necessary to accomplish the following:
(a) Remove all said Property from its present site down to ground level, including wood, brick or concrete block foundation posts or piers;
(b) Take down, preserve, and replace as directed by a representative of the Seller, such telephone, telegraph, or other wires or fences and their appurtenant poles or posts or other interferences which may obstruct the removal of the Property;
(c) Disconnect or cause to be disconnected, cap and render safe all utility connections and services to dwellings to be removed, including water, gas, and storm and sanitary sewer pipes and conduits;
* * * * #
(5) The Purchaser covenants that the Purchaser has a site available for the relocation of said 250 one-story portable family dwelling units within a five-mile radius, of San Miguel, California. Said site will be owned by the purchaser in fee simple prior to May 31,1952. The Purchaser will make available to the Seller evidence of title if so requested by the Seller.
(6) The Purchaser will transport and reerect the Property on a site within a five-mile radius of San Miguel, California, for the purpose of providing rental housing in the critical defense housing area of Camp Roberts, California, and the Purchaser shall first make such housing units available for rental to the military and civilian personnel attached to Camp Roberts, California. The Purchaser understands that in relocating and operating the Property described herein, it must comply with all laws and local ordinances which may be applicable and will secure and pay for all applicable.' licenses and permits.
(7) The Purchaser shall, not later than 200 calendar days, [sic] from the date the Purchaser receives title to the Property from the Seller, transport the Property and make all of the said 250 dwelling units ready and available for rental on the site described in paragraph 6' hereof. The Purchaser shall make said 250 units available for rental for a period of five years to the military and civilian personnel of Camp Roberts. In the event that during the aforesaid five-year period (which shall be construed to commence on the date on which all of the 250 dwelling units are made available for occupancy) the Commanding Officer of Camp Roberts determines that a need for any number of such housing units no *1014 longer exists, the requirements of this paragraph will not apply to any dwelling units in excess of the number determined to be needed by a written finding of the Commanding Officer. Subject to the provisions of the preceding sentence, when any vacancy occurs after a dwelling unit has been occupied by military or civilian personnel of Camp Eoberts, the Purchaser will hold such dwelling unit for the exclusive use of the military and civilian personnel of Camp Eoberts for a period of 30 calendar days.
29. Following execution of the contract, the contractor commenced moving 250 houses from Wilmington, California to San Miguel, California. The first of the houses arrived at San Miguel on May 29,1952, having been moved on truck beds without being disassembled. By August 20, 1952, 204 of the houses had been relocated at the Camp Eoberts area. The houses were repaired, and generally rehabilitated and shortly thereafter were opened for occupancy.
30. Some time after the execution of the initial contract and prior to October 22, 1952, the time for exercising the option on the second group of houses, Mr. Silbert made a second visit to Camp Eoberts. On this visit Mr. Silbert was accompanied by two of the larger investors in the project, Myer Gensburg and David Gensburg. The purpose of this trip was to obtain information in order to determine whether or not the investing group would make an additional investment in houses by exercising its option for the second group of 250 units.
31. By this time Mr. Silbert had heard of and was aware of the distinction between the terms “camp” and “fort”. Mr. Silbert therefore was- concerned with ascertaining if there was still a need for housing in the Camp Eoberts area. In addition, Mr. Silbert also was concerned with the cost of rehabilitating the houses, inasmuch as the cost of rehabilitation of the first group of houses had considerably exceeded the amount originally estimated.
32. On this visit Silbert with the Messrs. Gensburg, the plaintiffs’ principal investors, were told that the plaintiffs had done a fine job of moving and rehabilitating the first group of houses and the military officers with whom they talked were very anxious that the plaintiffs exercise the option as to the additional 250 houses because the need for *1015 housing was still great. They were told that there was a waiting list of over 1000 military persons who did not have and needed housing. The plaintiffs relied heavily on statements made to them by Colonel Eobert Stack, the Deputy Post Commander, relating to the continuing need for housing at Camp Eoberts. Everyone concerned with the transaction at this point knew that Camp Eoberts had been used during World War II and thereafter placed in a standby or inactive status. In other words it had been closed. They also knew that the action in Korea was the cause of its reactivation. Silbert inquired as to the possibility of the Camp, being deactivated again. Colonel Stack said that he had no control over whether the Camp might be deactivated but that Army officials generally regarded it as one of the outstanding training camps in the entire country. The Gensburgs asked the Colonel whether he would invest in such a project (related to the exercising of the option) and the Colonel said that he could not, as he was an Army officer, but that he believed the investment was a sound one. It should here be noted that no representative of the contracting officer was present and at no time did any representative of the contracting officer make or was asked to make any representation as to the permanence of Camp Eoberts.
33. Mr. Silbert understood that the Colonel’s statement about the permanency of Camp Eoberts was the Colonel’s own personal opinion. The other investors, the Gensburgs, believed that no one could tell how long the post might stay open and that this information could not be ascertained because it depended upon the length of the Korean war and when it would be over.
¡34. By December 9, 1952 the first 250 temporary houses, covered by the original contract, were in place and in use by military personnel.
35. On September 22, 1952 Amercal notified PHA of its desire to exercise the option to purchase the second group of 250 units. Subsequently, under date of October 22, 1952 the formal contract for the purchase of the second group of 25Ó portable family units was executed.
*1016 36. By April 1, 1953 the second group of 250 houses had been- moved and were made ready for occupancy and 388 of them were occupied by military tenants.
37. In the meantime the regional representative of Housing and Home Finance Agency at San Francisco, on December 29, 1952 advised the commanding officer of certain steps then being taken by that agency and PHA to provide further steps toward additional housing which was then in the process of being supplied in addition to the 500 houses with which the plaintiff was concerned.
38. On May 11, 1953, 405 of the 500 housing units were occupied. By June 1,1953,453 units were occupied.
39. On June 12, 1953 the Department of Defense issued a press release announcing the closing of seven Army installations, one of which was Camp Boberts. The aforesaid announcement indicated that Camp Boberts would be inactivated by J anuary 1, 1954. By Department of the Army General Order No. 56 dated 30 June 1953 Camp Boberts was placed in an inactive status, effective J anuary 1,1954. Subsequently, by Department of the Army General Order No. 87 dated November 18, 1953 Camp Boberts was placed in an inactive status effective November 15,1953. The evidence of record shows that the inactivation of Camp Boberts came about as a result of the events described hereinafter.
40. On May 15, 1951 the Department of the Army appointed an Installations Board composed of General Mark W. Clark, Lieut. General Thomas B. Larkin, Lieut. General Edward H. Brooks, and Major General Beuben E. Jenkins. In 1952 General John B. Hodge relieved General Clark as a member of the Board on May 15 and Major General C. D. Eddleman replaced Major General Jenkins on August 8. The Installations Board was directed to report and make recommendations on current and future needs of the Army for installations in the Zone of the Interior and permanent oversea garrisons. The principle governing the Board’s recommendations was that maximum economy in personnel and funds was to be attained without detriment to the effective accomplishment of the Army’s missions.
41. The Board also was to recommend which Army installations were to be retained permanently for full-time *1017 utilization in the event the Congress passed legislation implementing the National Security Training Program (Universal Military Training). On April 29, 1952, the Secretary of the Army further directed the Board to make recommendations about peacetime retention of installations based on the assumption that the proposed National Security Training Program would not be adopted.
42. On August 15, 1952, the Board issued a “Draft Report, Department of the Army Installations Board, [Tentative].” At that time said report was classified “Secret-Security Information.”
43. In its Draft Report, the Board recommended that if the National Security Training Program were made law, Camp Roberts, as well as ten other supplemental posts, be formally established as a permanent installation in Category “P”. Camp Roberts had been temporarily activated in August 1950 because of the Korean war. In the Draft Report, Category “P” was defined as follows:
P — A 'permanent installation at which, continuously in peacetime, —
a. Elements of the Army (other than caretakers) will be stationed, or
b. Activities of the Army will be conducted, or
c. Elements of the National Security Training Corps will be_ stationed for training, or
d. Week-end training for elements of the Organized Reserve Corps will be conducted.
44. In the event that the National Security Training Program did not become law, the Board recommended that Camp Roberts be placed in Category “S”, i.e., permanent retention primarily for use during mobilization with standby status in peacetime. In the Draft Report, Category “S” was defined as follows:
S — A supplemental installation retained primarily for use in National Emergencies to accommodate or support the expansion of the Active Army up to its planned strength at M/6 in a general mobilization. (Note: Standby industrial installations also support other services and agencies.)
45. It will be recalled that on January 20, 1953 a new administration entered into office and that the newly elected *1018 President, Dwight D. Eisenhower, had publicly expressed-opposition to universal military training during the immediately preceding election campaign.
46. In January 1953, the Secretary of the Army approved the Board’s recommendation that Camp Roberts remain a supplemental installation in Category “S”. Under date of April 21, 1953, the Acting Secretary of the Army requested the' Army Chief of Staff to review the entire station inactivation program and to present a revised program by May 21,1953. On May 22,1953 a staff recommendation was made to the Secretary of the Army that Camp Roberts and other installations be inactivated by January 1, 1954. On June 12, 1953, Earl D. Johnson, Acting Secretary of the Army approved the staff recommendation of May 22, 1953.
47. The evidence of record shows that during the pertinent period neither General Partridge, the Commanding Officer of Camp Roberts, nor Colonel Stack, the Deputy Post Commander, had any knowledge of the Department of the Army Installations Board, its activities or its recommendations. Both were surprised by the announcement of June 12, 1953 that Camp Roberts would be closed. During his tenure as Commanding Officer of the Camp, General Partridge received no information from the Department of the Army or any other source as to how long the Camp might remain open.
48. With the inactivation of Camp Roberts, the source of tenants vanished for the 500 houses which the plaintiff had moved and rehabilitated for occupancy by military personnel. In order to reduce the certain loss which the plaintiff suffered from the entire operations at Camp Roberts, it sold off the houses for removal from the site. The houses were sold in various years as the market permitted and at the amounts shown below.

Tear Ending Number of Units Sold Amount Realized

September 30, 1954_ 70 $67,626.02
September 30, 1955_ 79 52,325.00
September 30,1956_— 228 110,209.50
September 30, 1957_ 120 28,912.00
September 30, 1958_ 3 850.00
500 $259,922.52
*1019 In addition, the plaintiff realized an additional sum from the sale of furnishings of the houses so that the total gross receipts from the sale of both houses and furnishings amounted to $289,486.38.
49. The investors who are plaintiffs in this suit entered into the transactions in connection with purchase and removal for erection of the 500 houses at Camp Roberts with the objective in view of obtaining a return on their investment. They had the benefit of capable legal assistance. After the erection of the houses at Camp Roberts, the unknown factor bearing upon the possibility of a profit to the plaintiffs was the length of the Korean war. This was a risk of investment which the plaintiffs accepted after careful consideration of the factors involved. It must have been clear to Silbert and the Messrs. Gensburg that the Army officials with whom they talked wanted housing for their personnel as long as there were such personnel without housing. The Army officials to whom they talked were not contracting officers. It is found that no misrepresentations were made by either Army personnel or contracting officer personnel concerning the duration of the need for housing by military personnel at Camp Roberts. In this connection, it should be noted that the 500 houses were temporary houses capable of being and which were in fact moved on low-bed trucks.
50- The plaintiffs’ only proof of damages is contained in two joint exhibits, No. 117 being the plaintiffs’ statement under old rule 28(b) (2) and No. 118 being the defendant’s audit statement upon the claim. The plaintiff is entitled to any admission contained in the defendant’s audit statement. On page 2 thereof, the defendant’s accountant (who testified) shows that on the entire operation from the time the plaintiff purchased the houses until it sold the last house, it showed a loss of at least $325,677.76. This figure has taken into account the matter of depreciation on the houses.
The plaintiff still owns something over 20 acres of land at the Camp Roberts location. In addition, 9.63 acres of the land purchased by the plaintiff were condemned by and paid for by the California Highway Department.
*1020 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 Plaintiffs’ petition charged defendant with breach through misrepresenta-, tion. As a result of adverse findings on this point, however, plaintiffs have apparently abandoned the misrepresentation claim and shifted to the implied contract theory.

 63 Stat. 570 (1949), 12 U.S.C. §§ 1702, 1706, 1715(c), 1716, 1748-1748(g) (1964 ed.)

 Mold had completed negotiations for 21 acres of land near San Miguel, California in August, 1951.

 Findings 19, 20 and 21 contain the detailed facts of the changeover in investment groups.

 Silbert’s investment group had by that time apparently taken control of tbe Amereal Corporation. Amereal Corporation subsequently dissolved in December, 1952 with tbe stockbolders, tbe present plaintiffs, continuing to> operate tbe venture as a partnership, Almond Acres Housing Project.

 Such a determination naturally could not have been made at the mere caprice of the Commanding Officer. The determination would have to have been a good faith one, based on need.

 Plaintiff in Henry Barracks also alleged a misrepresentation by defendant.