ALTA VERDE INDUSTRIES, INC.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 2–88 C.

United States Claims Court.

Nov. 15, 1989.

Robert G. Mullendore, Missoula, Mont., for plaintiffs.

George M. Beasley, III, Washington, D.C., with whom were David M. Cohen and Stuart Schiffer, Acting Asst. Atty. Gen., for defendant.

## OPINION

RADER Judge.

Alta Verde Industries (plaintiffs) claim to represent a class consisting of all ranchers who sold beef in the United States between March 28, 1986 and September 30, 1986. Plaintiffs contend that the United States Department of Agriculture (USDA) caused serious economic harm to the beef industry by failing to comply with statutory requirements designed to protect meat prices during the Dairy Termination Program (DTP). Plaintiffs contend that USDA regulations did not protect meat prices as contemplated by the DTP. When these regulations issued, the beef futures market suffered an unprecedented collapse. This market collapse depressed the price of beef and reduced the value of plaintiffs' cattle. Plaintiffs seek compensatory damages under the Food Security Act of 1985 (the Act), the fifth amendment to the Constitution, and the doctrine of unjust enrichment.

Defendant moves to dismiss pursuant to RUSCC 12(b)(1) because the United States Claims Court lacks jurisdiction over plaintiffs' claims. Plaintiffs oppose the motion to dismiss and move instead for partial summary judgment.

After oral argument, this court grants defendant's motion to dismiss the complaint for lack of subject matter jurisdiction. Therefore this court need not address plaintiffs' cross-motion for partial summary judgment.

## FACTS

In an effort to reduce federal dairy price support payments, Congress enacted the DTP in 1985. 7 U.S.C. § 1446(d)(3) (1988). To reduce over-production of milk, Congress permitted dairy farmers to enter into contracts with USDA. Under these contracts, the farmers agreed to dispose of their dairy cattle and not produce milk for at least five years. In exchange, USDA agreed to offer an incentive payment and also to allow the dairy farmers to retain the proceeds from the sale of cattle.

Congress recognized that the slaughter of dairy cattle could increase the supply of beef on the market and reduce beef prices. A decline in meat prices would affect beef, pork, lamb, and poultry producers. Therefore, in addition to requiring the Secretary of USDA to "take all feasible steps to minimize" harm to beef producers, 7 U.S.C. § 1446(d)(3)(C), Congress included several provisions circumscribing USDA's implementation of the program.[1] Congress required USDA to:

specify [by regulation] marketing procedures to ensure that greater numbers of dairy cattle slaughtered ... shall be slaughtered in each of the periods of April through August 1986, and March through August 1987 than for the other months of the program. Such procedures also shall ensure that such sales of dairy cattle for slaughter shall occur on a basis estimated by the Secretary that maintains historical seasonal marketing patterns ... the Secretary shall limit the total number of dairy cattle marketed for slaughter under the program in excess of the historical dairy herd culling rate to no more than 7 percent of the national dairy herd per calendar year.

7 U.S.C. § 1446(d)(3)(A)(iii)(II). Congress also instructed USDA to purchase and distribute 400,000,000 pounds of red meat in addition to those quantities normally purchased. 7 U.S.C. § 1446, note at pp. 671–72 (1988).

The 1985 Act thus required USDA to spread the slaughter of dairy cattle over a longer period of time. The Act specifically mentioned three time frames. The Act ensured slaughter of more cattle in the first (April–August 1986) and third (March–August 1987) periods than during the interim period of six months (September 1986–February 1987). By reducing slaughtering during the interim period, Congress hoped to ease the effect of this dairy cattle disposal program on the beef market.

The beef market experienced no significant changes upon Congressional approval of the DTP in December 1985. Beef prices, however, began an unprecedented and precipitous decline four months later. On March 28, 1986, USDA announced regulations implementing disposal of cattle. Beef prices plummeted almost immediately. The futures market in Chicago actually closed down for days, making trade impossible. The market for beef remained unstable for months after the announcement.

Plaintiffs attribute the collapse of the beef market, and their subsequent loss of profits, to USDA's alleged failure to follow the standards set forth by Congress in the Food Security Act of 1985. Specifically, plaintiffs allege that USDA's regulations exercised too little control over the timing of the slaughters. USDA regulations, according to plaintiffs, did not ensure the slaughter of greater numbers of dairy cattle in the first and third disposal periods than in the second. According to plaintiffs, these inadequacies in the USDA regula-

---

1. Congress directed USDA to carry out the DTP through the Commodity Credit Corporation. 7 U.S.C. § 1446(d)(7). All references to USDA are intended to include the Commodity Credit Corporation to the extent it was involved in carrying out the DTP.

tions precipitated the panic which drove down meat prices.

USDA regulations permitted milk producers to slaughter their cattle any time within the five-or six-month disposal period specified in their contract. 7 C.F.R. § 1430–458. In addition, the regulations allowed dairy farmers to sell all of their heifers and calves and up to half of their cows before the beginning of the specified disposal period. *Id.* Consequently, under USDA regulations, plaintiffs charge that dairy farmers could have slaughtered 89.7% of their eligible dairy cattle in the first few days of the program. According to plaintiffs, this possibility triggered the collapse of the beef market.

As in fact implemented, the bids accepted by USDA for the first disposal period involved 65.5% of the total cattle covered by the bids, 11.4% for the second disposal period, and 23.1% for the third. Thus, slaughtering in the first and third periods exceeded slaughtering in the second time frame. In operation, USDA regulations fulfilled the literal requirements of the 1985 Act with regard to timing of the slaughtering.

Plaintiffs also argue that USDA regulations did not maintain historical marketing patterns. USDA instructed county officers to accept bids for the earlier disposal period when a milk producer submitted identical bids for more than one period. USDA Agricultural Stabilization and Conservation Service, *Accepting DTP bids,* (Notice LD–257) (March 28, 1986). This policy "front-end loaded" the program. Historically, however, the first period occurred during a season of the year when the marketing of beef for slaughter is low. Plaintiffs nonetheless contend that this policy violated the historical pattern provision of the 1985 law.

Finally, plaintiffs charge that USDA failed to cap the number of dairy cattle slaughtered at 7% of the national dairy herd per calendar year. Plaintiffs cited these policies as further reasons that beef futures investors abandoned the market.

A few days after USDA's March 28, 1986 announcement, seven beef producers' and three cattle producers' associations instituted a suit in the United States District Court for the Northern District of Texas to enjoin the regulations. *Shelton v. United States Dept. of Agric.,* Civ.A. No. CA–5–86–81 (N.D.Tx.). The Texas District Court granted a preliminary injunction within one month. This litigation ended with a settlement accepted by both USDA and the cattle producers' associations. Under this settlement, USDA agreed to modify the DTP in several ways. For instance, USDA agreed to encourage DTP participants with contracts for the first disposal period to shift their slaughtering to the second or third disposal period. Plaintiffs contend, however, that this settlement only partially mitigated their damages.

Plaintiffs filed this action in the Claims Court on January 4, 1988, seeking compensatory damages. Plaintiffs make three claims against the United States. First, Congress created an implied mandate for monetary compensation under the DTP by imposing clear and objective requirements in the DTP to protect beef producers. Second, USDA's interference with plaintiffs' right to dispose of their cattle constitutes a taking under the fifth amendment to the Constitution. Third, the United States was unjustly enriched when it purchased large amounts of beef at depressed prices in the months following the implementation of the DTP.

Defendant moves to dismiss for lack of subject matter jurisdiction. Defendant maintains that Congress did not intend to provide monetary compensation under the DTP—a requirement for Tucker Act jurisdiction. Defendant also asserts a jurisdictional challenge to plaintiffs' unjust enrichment claim. Finally, defendant contests the merits of plaintiffs' fifth amendment taking claim. Plaintiffs filed a cross-motion for partial summary judgment asserting the absence of any genuine factual dispute.

## DISCUSSION

Plaintiffs ask this court to transform defendant's jurisdictional motion into a motion to dismiss for failure to state a claim. Plaintiffs contend that this court has jurisdiction under the Tucker Act.

In assessing a motion to dismiss, whether on the ground of lack of subject matter jurisdiction or failure to state a cause of action, this court must accept the facts alleged in the complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Plaintiffs' mere allegation that their claim springs from a statute, constitutional provision, or contract does not confer Tucker Act jurisdiction upon the Claims Court. A claim must arguably fit within the jurisdiction conferred by the Tucker Act to invoke Claims Court decisional authority. *Ralston Steel Corp. v. United States*, 169 Ct.Cl. 119, 125, 340 F.2d 663, 667, *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). The Court of Claims set the standard for weighing RUSCC 12(b) motions:

> [A] claimant who says that he is entitled to money from the United States because a statute or a regulation grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable.

*Id.* Arguable claims satisfy all jurisdictional elements. Frivolous claims, when used in this context, do not necessarily imply abuse of process or bad faith. Claims are frivolous when they fail to satisfy each of the elements required to establish jurisdiction. *See also, Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 105–06, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933); *Truckee–Carson Irrigation Dist. v. United States*, 14 Cl.Ct. 361, 369, *aff'd*, 864 F.2d 149 (Fed. Cir.1988).

The facts made available to the court and described herein establish that plaintiffs clearly fail to meet their jurisdictional burden under the Tucker Act. Consequently, this court must, as a matter of law, dismiss plaintiffs' complaint for lack of subject matter jurisdiction.

### Statutory Claim

Plaintiffs contend that Congress created an implied mandate for compensation by imposing clear and objective requirements in the DTP to protect beef producers.

Plaintiffs assert the Tucker Act as the basis for Claims Court jurisdiction:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982).

■ For the Claims Court to adjudicate claims—even actions stemming from the Constitution, a federal statute, or an executive branch regulation—the claimant must seek money damages. *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). The Tucker Act does not supply an independent basis for monetary relief in the Claims Court. Rather, plaintiffs must invoke a substantive right to receive monetary compensation from the Government in some independent source of federal law, such as the Constitution or an Act of Congress. *Id.* 372 F.2d at 1008. The Tucker Act merely confers jurisdiction upon the Claims Court to enforce independent rights to monetary relief. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).

■ Thus, plaintiffs must show both that their claim springs from a source of federal law independent of the Tucker Act and that the independent law "can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* at 400, 96 S.Ct. at 954, *quoting Eastport*, 372 F.2d at 1009. In sum, plaintiffs must show an arguable right to monetary relief in a federal law outside the Tucker Act.

The DTP did not expressly mandate monetary compensation for beef producers in the event that USDA failed to obey the law. Plaintiffs concede the absence of an express damages remedy in 7 U.S.C. § 1446(d)(3), but assert instead that Congress implicitly mandated money damages. Plaintiffs find this implication in Con-

gress's strong intent to protect beef producers from economic harm under the DTP. Plaintiffs claim this intent is evinced by guidelines that the USDA was required to follow during implementation of the program.

Congress's intent to protect beef producers does not alone create a monetary damages remedy. In 7 U.S.C. § 1446, Congress provided beef producers with prospective protections, rather than a retroactive monetary damages remedy. 7 U.S.C. § 1446 included specific periodical slaughtering quotas. Thus, beef producers could and did seek enforcement of these quotas in federal district court. Indeed the United States District Court for the Northern District of Texas granted a preliminary injunction halting the DTP for failure to comply with these quotas. Congress provided judicial protections for beef producers, but not monetary damages.

The legislative history of the 1985 Act also discloses no Congressional intent to create a damages remedy. The potential threat to beef producers was prominent throughout the Congressional proceedings leading to enactment of the DTP. Nonetheless, at no point does the legislative history indicate that Congress even contemplated compensating beef producers for lost profits. The legislative history requires the Secretary of Agriculture to comply with certain statutory regulations of the Act, but nowhere mentions a monetary remedy for injured beef producers.[2]

Plaintiffs rely on several cases where the Court of Claims or the Claims Court granted jurisdiction in the absence of an express statutory provision for monetary damages. This court, however, finds distinctions in each of those cases.

In *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), the Supreme Court reviewed various federal statutes granting the Government full responsibility for managing resources and lands on the Quinault Indian Reservation for the benefit of the Indians. The Court concluded that these statutes could fairly be interpreted as mandating compensation by the United States for damages sustained by the Indians. The

**2.** The legislative history states in pertinent part:

In setting the terms and conditions of reduced production and production termination milk diversion contracts, the Secretary would be required to take into account the adverse effects of diversion contracts on beef, pork, and poultry producers and take all feasible steps to minimize such effects.

Before the beginning of a fiscal year in which a milk diversion program is to be in effect, the Secretary would be required to estimate the number of dairy cattle that will be marketed for slaughter as a result of the program. The Secretary also would be required to specify marketing procedures, under contracts under the program, to ensure that not more than 40 percent of the number of dairy cattle that he estimates will be marketed for slaughter by producers participating in the program in excess of the number of dairy cattle they would market in the absence of the program will be so marketed in October, November, December, January, February, and September of that fiscal year. The procedures would have to ensure that the excess sales for slaughter occur on a basis that maintains historical marketing pattern. In addition, the Secretary would be required to limit the total dairy cattle slaughter rate under the program in excess of the historical dairy cow herd culling rate to no more than seven percent of the national dairy cow herd.

. . . .

Section 214 provides that, to minimize the adverse effect of a milk diversion program carried out during any fiscal year under the bill on beef, pork, and lamb producers in the United States, in such fiscal year—

(1) the Secretary of Agriculture must use funds available for food donations under section 32 of Public Law 320, Seventy–Fourth Congress, other funds available to the Secretary under the commodity distribution and other nutrition programs of the Department of Agriculture, and funds available through the Commodity Credit Corporation, to purchase and distribute two hundred million pounds of red meat in addition to those quantities normally purchased and distributed by the Secretary.

(2) the Secretary of Defense and other Federal agencies, to the maximum extent practicable, must use increased quantities of red meat to meet the food needs of the programs that they administer, and State agencies would be encouraged to cooperate in such an effort; and

(3) the Secretary of Agriculture must act to encourage the consumption of red meat by the public.

H.R. No. 271(I), 99th Cong., 1st Sess., 205, 208, *reprinted in* 1985 U.S.Code Cong. & Admin. News, 1103, 1308–09, 1311–12.

critical element in the Court's recognition of a damage remedy was the existence of a trust relationship. The right to sue a trustee for damages was a "fundamental incident" of the trust relationship. *Id.* at 226, 103 S.Ct. at 2973. Because the United States held the reservation in trust for the Indians, the Indians could sue for breach of trust. Unlike the trust relationship in *Mitchell II,* no special relationship exists between beef producers and the United States. USDA entered into agreements with dairy farmers, not beef producers. Moreover, Congress chose to protect beef producers with quotas enforceable by injunction, rather than with a monetary remedy.

Plaintiffs also cite *Barber v. United States,* 230 Ct.Cl. 287, 676 F.2d 651 (1982), to support the proposition that this court can imply a damages remedy. In *Barber,* the widow of a serviceman sought annuity payments under the Armed Forces Survivor Benefit Act. 10 U.S.C. § 1448(a) (1982). The Act and regulations promulgated thereunder require the armed forces to notify the serviceman's spouse in writing if the serviceman elects to reduce or eliminate payments into the annuity fund. The Air Force failed to notify Mrs. Barber of her husband's election. The Act did not state that a serviceman's spouse may recover the value of the annuity from the United States, but the Court of Claims nonetheless allowed plaintiff to obtain money damages.

*Barber,* however, merely preserved a statutory entitlement to money. The Act promised the spouse money in the form of an annuity. The surviving spouse retained the annuity entitlement because the Government failed to notify her that her husband elected to cancel his scheduled payments into the annuity fund. In the case at bar, plaintiffs present no evidence that Congress created an entitlement to a certain market price for beef. Thus, the *Barber* principle—money or preservation of an entitlement to money in the fact of a miscarriage by the Government which caused a lapse in the entitlement—does not apply.

This case does not fall within the narrow circumstances in which money-mandating provisions have been implied in the past. Congress must specifically mandate monetary compensation. Because there is no explicit language by Congress indicating its consent to suit by injured beef producers, and because the legislative history is void of such an intent, this court lacks subject matter jurisdiction over this claim.[3]

Though Congress provided no monetary remedy for beef producers, it did provide a remedy in the form of an injunction, which plaintiffs invoked in an earlier lawsuit. Ironically, plaintiffs relied on the theory that they could not recover money damages to persuade the district court to grant the equitable relief.

### *Fifth Amendment Taking*

■ Plaintiffs assert in their second claim that the value of their cattle was substantially reduced as a result of USDA's implementation of the DTP. This reduction, they contend, constitutes a taking under the fifth amendment of the United States Constitution, which prohibits the Government from taking private property without just compensation.

---

3. Other cases cited by plaintiffs still do not alter the long line of cases discouraging courts from interpreting statutes to include monetary damages by implication. In *Bisom v. United States,* 5 Cl.Ct. 454 (1984), plaintiff, a federal employee who alleged improper discharge from employment, sought back pay even though the statute in question did not contain any express provision. The court held that where Congress grants certain employees removal protections, a remedy for financial loss in the event of an unlawful discharge is necessarily implied. *Id.* at 457. This case followed many precedents granting jurisdiction to suits for back pay. These cases have reasoned that the only remedy for wrongful denial of pay is money. *United States v. Wickersham,* 201 U.S. 390, 399, 26 S.Ct. 469, 472, 50 L.Ed. 798 (1906).

In *Grav v. United States,* 14 Cl.Ct. 390,(1988), *aff'd,* 18 Cl.Ct. 18, 886 F.2d 1305 (Fed.Cir.1989), Congress required the Secretary of Agriculture, under a milk diversion program, to enter into contracts with any producer who qualified for the program. The court relied on an implied-in-fact contract, not an implied money-mandate, to justify an award of a money damages.

Property consists of a bundle of rights including possession, use, and disposal. *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *see also, United States v. General Motors Corp.,* 323 U.S. 373, 377–78, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). Plaintiffs contend that the property right at issue in this case is the right of disposal. Though plaintiffs admit that the Government did not completely prevent them from disposing of their cattle, they contend that it substantially interfered with this right.

Plaintiffs characterize the alleged taking as a "regulatory taking" as opposed to actual confiscation of their property by the Government. Indeed, USDA did not actually seize any cattle. Regulatory takings are those in which the Government, by regulatory action, diminishes the value or usefulness of private property. *Hall v. City of Santa Barbara,* 813 F.2d 198, 202 (9th Cir.1987). Plaintiffs claim that USDA's implementation of the DTP created enough uncertainty in the beef market to cause the market collapse. This collapse, according to plaintiffs, reduced the price of beef so substantially as to be tantamount to outright appropriation of the cattle.

The Supreme Court stated, in addressing the issue of regulatory takings, that governmental regulation "does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land,'" *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3146–47, 97 L.Ed.2d 677 (1987), *quoting Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The Court suggests that the first prong of this test—a legitimate state interest—requires a "fit" between the purpose of the regulation and the burden placed upon the property owner. *Id.* 483 U.S. at 838, 107 S.Ct. at 3148–49. The second prong of the test requires the plaintiff to show that the governmental action diminished the value of a significant aspect of the plaintiff's property. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922).

According to the facts of the present case, plaintiffs clearly fail to meet their burden with respect to the second prong of the test. Therefore, this court need not address the issue of regulatory "fit." Plaintiffs in this case claim the manner in which USDA implemented the DTP substantially reduced the value of their cattle, which, in turn, discouraged disposal. However, the Government never prevented plaintiffs from disposing of their cattle nor did it render them valueless. Their expected profits were merely reduced as a result of Government action.

The Court of Claims held in a number of cases regarding administrative takings that consequential damages, such as reduced profits, resulting from lawful agency action are not recoverable. *Carruth v. United States,* 224 Ct.Cl. 422, 446, 627 F.2d 1068, 1081 (1980); *Mosca v. United States,* 189 Ct.Cl. 283, 417 F.2d 1382 (1969), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970). The facts of this case are similar to those of a recent Federal Circuit case. *Galloway Farms, Inc. v. United States,* 834 F.2d 998 (Fed.Cir.1987). Appellants in *Galloway* asserted that a Government grain embargo caused a reduction in profits from the sale of their farm products. The Federal Circuit held that losses which result from commercial interference due to lawful Government action provided no fifth amendment remedy. *Galloway,* 834 F.2d at 1002.

Plaintiffs argue that USDA's implementation of a program directed at the dairy industry commercially interfered with the beef market. As a result, beef producers experienced a loss of expected profits resulting from the Government action. This loss of expected profits does not give rise to an actionable fifth amendment taking.

Moreover, plaintiffs allege that the Government acted unlawfully. Plaintiffs assert on numerous occasions that USDA "violated" the statutory requirements imposed upon it by Congress. Yet, for a taking claim within the Claims Court's Tucker Act jurisdiction, governmental action must be correct and authorized. *Flor-*

**602**

*ida Rock Indus., Inc. v. United States,* 791 F.2d 893, 898–99 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Claims of unlawful Government action are outside this court's takings clause jurisdiction.

*Unjust Enrichment*

 Plaintiffs, in their final claim, assert that the Government was unjustly enriched when it purchased large amounts of beef at depressed prices. Plaintiffs contend that these depressed prices were the result of USDA's failure to carry out the intent of Congress with respect to the implementation of the DTP. The Government purchased this beef both in the ordinary course of affairs and pursuant to the requirements of § 104 of the Food Security Act of 1985.[4] Congress intended to benefit the beef industry through these increased purchases, not injure it. At oral argument, however, plaintiffs stated that they expected the Government to purchase this beef at a "reasonable" market price.

The Claims Court possesses jurisdiction pursuant to the Tucker Act to entertain suits based upon implied contracts with the Government. This clause, however, has been narrowly construed as referring only to contracts implied-in-fact. *Mitchell II,* 463 U.S. at 218, 103 S.Ct. at 2968. Contracts implied-in-law are equitable in nature. They are not based on an agreement between the parties, but impose a duty at law to prevent injustice. *Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl.

146, 164, 655 F.2d 1047, 1059–60 (1981); *Hirschmann v. United States,* 11 Cl.Ct. 338, 342 (1986). An unjust enrichment claim rests on a contract implied-in-law over which this court lacks jurisdiction. *EWG Assocs., Ltd. v. United States,* 231 Ct.Cl. 1028, 1030 (1982) (Order); *Fincke v. United States,* 230 Ct.Cl. 233, 246, 675 F.2d 289, 296 (1982).

CONCLUSION

No statute exists which can be fairly construed as mandating compensation from the United States for the damages sustained by beef producers. These alleged damages—reduced profits resulting from lawful Government action—are not recoverable in this court. In addition, the Tucker Act does not confer jurisdiction upon this court to entertain claims based upon the doctrine of unjust enrichment.

Therefore, this court grants defendant's motion to dismiss the complaint for lack of subject matter jurisdiction and denies plaintiffs' cross-motion for partial summary judgment. The Clerk of the court is directed to enter judgment dismissing the complaint.

No costs.

---

**4.** Section 104 of the Food Security Act of 1985 required USDA to purchase 400,000,000 pounds of red meat in addition to those quantities normally purchased. 7 U.S.C. § 1446, note at pp. 671–72 (1988).