**MASSACHUSETTS BAY TRANSPORTA-
TION AUTHORITY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 283–89 C.

United States Claims Court.

July 31, 1990.

Rudolph F. Pierce, Boston, Mass., for plaintiff.

Agnes Brown, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Massachusetts Bay Transit Authority (plaintiff or MBTA) entered into agreements with the Federal Railroad Administration (FRA) between 1980 and 1983 to renovate the South Station in Boston. Under these agreements, FRA promised to fund a portion of the renovation. Plaintiff promised to remodel the station according to FRA's design.

During construction, plaintiff's contractors complained about defects in the design documents. These defects caused delays and cost overruns. In this lawsuit, plaintiff seeks to recover the damages allegedly caused by the design defects.

Defendant has moved to dismiss plaintiff's claim for lack of jurisdiction. Defendant contends primarily that plaintiff's cause of action is not ripe for decision. Defendant also requests summary judgment on a warranties issue. Plaintiff

has moved for summary judgment, claiming that FRA jeopardized plaintiff's chance to recover from the design consultants' liability insurance policies. This court grants in part defendant's motion to dismiss, grants defendant's motion for summary judgment, and denies plaintiff's motion for summary judgment.[1]

## FACTS [2]

In 1976, Congress enacted the Railroad Revitalization and Regulatory Reform Act (Rail Act). 45 U.S.C. §§ 801–855 (1982). Congress intended the Rail Act to improve the infrastructure and financial strength of the nation's railway system. The Declaration of Policy states:

It is the purpose of the Congress in this Act to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States....

45 U.S.C. § 801(a).

Congress specifically enacted legislation to deal with improvement of the eastern seaboard railway system from Massachusetts to the District of Columbia. 45 U.S.C. §§ 851–855. This aspect of the Rail Act is the Northeast Corridor Improvement Project (NECIP). The NECIP set several objectives for the Secretary of Transportation (Secretary). Under NECIP, the Secretary must establish dependable intercity rail service, improve stations, enhance rail freight service, upgrade equipment, and eliminate rail congestion. 45 U.S.C. § 853. Congress authorized appropriations in excess of $2.3 billion to accomplish these goals. 45 U.S.C. § 854.

The Secretary delegated authority over NECIP to FRA, an agency within the Department of Transportation. FRA funded and supervised the rehabilitation and improvement of 13 railroad stations, including the South Station Project.

### The South Station Project

South Station is an intercity rail passenger depot in Boston, Massachusetts. Plaintiff, a quasi-public corporation created under Massachusetts law, owns South Station. FRA targeted South Station for improvements under NECIP. Thus, plaintiff and FRA entered into the Boston South Station Improvement Project. FRA earmarked a $33.3 million grant for this project.

On or about November 5, 1980, plaintiff and FRA executed the Boston South Station Improvement Project Design Agreement. Under this agreement, FRA agreed to supply designs for construction of platforms and tracks, renovation of the station house, construction of additions to the station house, and correction of building code deficiencies. FRA retained engineering consultants to prepare these plans.

FRA had ultimate authority over the designs. Plaintiff had no authority to make design decisions or to supervise the design engineers. Further, FRA was responsible for coordinating its plans with Amtrak, which daily operated trains into and out of South Station.[3]

On or about September 8, 1983, plaintiff and FRA entered into the Boston South Station Transportation Center Project Cooperative Construction Agreement. This agreement generally set in motion construction according to FRA's designs.

Plaintiff agreed to construct operational, cost-shared, and local improvements in ac-

---

**1.** This court must review a motion to dismiss for lack of jurisdiction before a motion for summary judgment. Plaintiff's summary judgment motion does not survive defendant's jurisdictional challenge.

**2.** When evaluating a motion to dismiss for lack of subject matter jurisdiction or a motion for summary judgment, this court must review the facts in a light most favorable to plaintiff. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987); *Featheringill v. United States*, 217 Ct.Cl. 24, 26 (1978). Thus, in resolving the matters at issue, this court construes the facts in plaintiff's favor.

**3.** To accomplish the desired design and subsequent construction work, the Federal Railroad Administration (FRA) had to obtain Amtrak's cooperation to remove some railroad tracks at the South Station. The parties understood that delays in removal of Amtrak tracks would delay other aspects of the South Station project.

cordance with the designs. FRA agreed to pay for 100% of the operational improvements and 50% of the cost-shared improvements. The Construction Agreement explained:

> FRA will bear 100 percent of the costs of the "operational" improvements (those primarily benefitting Amtrak service) and 50 percent of the costs of the "cost-shared" improvements (rail-related improvements not primarily benefitting Amtrak). MBTA will bear 100 percent of the costs of certain "local" improvements.

*See* Contract No. DOT–FR–76048, quoted in Plaintiff's Brief, No. 283–89C, filed Dec. 11, 1989 (Pl.Br.), Appendix (App.), at 5. Plaintiff represented that it had sufficient funds to meet these obligations.

Under the Construction Agreement, plaintiff could not deviate from the design documents without first obtaining written permission from FRA. FRA could not withhold permission unreasonably. Moreover, FRA agreed to review requests for modifications within a reasonable time. When FRA approved change orders, the Construction Agreement required the parties to attempt in good faith to determine their proportionate funding obligations.

The Construction Agreement addressed resolution of potential liability issues. The agreement gave FRA authority to approve or reject settlements of contractor claims proposed by plaintiff. FRA, however, could not withhold approval unreasonably.

Further, the Construction Agreement required either FRA or plaintiff to pay contractor claims based on which one was at fault. In the case of contractor delay claims caused by Amtrak, FRA agreed to hold plaintiff harmless.

The Construction Agreement also discussed the prospect of defective designs and specifications. The agreement obligated FRA to seek compensation from its consultants for design defects. FRA thus promised to secure from these consultants endorsements on their professional liability insurance policies to cover any defects. In the Construction Agreement, FRA also disclaimed all express and implied warranties on the design documents.

After receipt of FRA's designs, plaintiff awarded a $48,775,062.10 contract to J.F. White Contracting Company (White) for much of the work on the site. During performance, White informed plaintiff that the design plans contained serious defects.[4] White also informed plaintiff that it could not perform timely because Amtrak did not remove railroad track on schedule. White has submitted to plaintiff for payment a $23,500,000.00 delay claim.[5]

During construction, plaintiff submitted to FRA proposed change orders and contractor claims for approval. FRA withheld consent on these changes and claims. Plaintiff nevertheless has incurred over $3 million in costs to pay for change orders allegedly necessitated by defective designs.[6]

---

**4.** These defects included: inaccurate plans for the station house, making it impossible to erect and align beams; the unexpected presence of a power vault, making it impossible to build an addition to the station house as specified; insufficient information on the amount of contaminated material that would have to be removed to comply with government regulations; failure to specify removal of rotted floors, requiring J.F. White Contracting Co. (White) to install concrete floors; inaccurate sprinkler system plans; installation of temporary trackhead structure to allow passenger access during delays; and failure to specify the extent of below-grade granite and masonry removal.

**5.** Plaintiff rejected White's first attempt to submit a claim. The original submission was vague and disorganized. Mr. Richard U. Cogswell, FRA's project manager, stated on Septem-

ber 1, 1989, that "final resolution of the White Delay Claim is probably a year away." Cogswell Declaration, Defendant's Brief, No. 283–89 C, filed Sept. 14, 1989, App. at 3, ¶ 9. At oral argument on June 28, 1990, plaintiff's counsel represented that resolution of the revised claim would not occur for at least another six months.

**6.** Plaintiff has incurred over $3 million in damages from change orders involving work on the sprinkler systems, station house entrances and exits, walkways, and stationhouse floors. Plaintiff's Brief, No. 283–89C, filed Dec. 11, 1989 (Pl.Br.), Appendix (App.), at 2. It also has lost over $500,000.00 in rental income because of contractor delays from the defective plans. *Id.* at 3. Finally, plaintiff has incurred approximately $500,000.00 in legal and consultant expenses in trying to resolve the White delay claim. Pl.Br., App., at 21. As a consequence,

## Litigation History

On April 25, 1988, plaintiff filed an action against FRA's architectural engineers for the South Station and NECIP projects. *Massachusetts Bay Transp. Auth. v. Deleuw, Cather & Company,* No. 88–2438, Massachusetts Superior Court, Department of the Trial Court for Civil Business. Plaintiff's state court complaint stated:

> [The engineering consultants] failed to perform design and other professional services in accordance with the terms of various contracts entered into by them and in accordance with applicable professional standards of care and skill. As a result, serious construction delays and other problems have occurred on the ... Project, resulting in substantial cost increases to the MBTA.

Defendant's Brief, No. 283–89 C, filed Sept. 14, 1989 (Def.Br.), Appendix (App.), at 9. The parties in this state court action have engaged in extensive discovery since 1988. However, discovery is not complete.

At the time it filed the state court action, plaintiff also instituted an administrative claim under the Federal Tort Claims Act. The allegations are substantially the same as those in this case. Plaintiff claimed $24 million in damages. FRA concluded that MBTA's claim was not cognizable under the Federal Tort Claims Act. Consequently, in October 1988, FRA denied the administrative claim.

On May 18, 1989, plaintiff instituted suit in the United States Claims Court. Plaintiff's complaint states three types of claims. First, FRA allegedly breached express and implied warranties by providing plaintiff with defective designs. Second, the design defects allegedly caused delays in the local improvements funded entirely by plaintiff. Third, Amtrak allegedly did not dismantle track on schedule, thus costing plaintiff additional delay expenses. Plaintiff also claims that FRA did not seek compensation from the engineers who supplied defective specifications.

Defendant has moved to dismiss plaintiff's claims for lack of subject matter jurisdiction. Specifically, defendant charges that plaintiff's claims are not ripe for review. In the alternative, defendant asks for summary judgment on the breach of warranty issue. Plaintiff has opposed defendant's motions. Plaintiff also seeks summary judgment on the issue of whether defendant improperly failed to secure endorsements on the consultants' professional liability insurance.

## DISCUSSION

 Before resolving the merits of a case, this court must ascertain whether it has jurisdiction over the subject matter at issue. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). In evaluating its jurisdiction, this court must construe facts in a light most favorable to plaintiff. *Featheringill v. United States,* 217 Ct.Cl. 24, 26 (1978). The court may examine documents outside the pleadings to determine the basis for jurisdiction. RUSCC 12(b); *see also, Alta Verde Indus., Inc. v. United States,* 18 Cl.Ct. 595 (1989), *aff'd,* without opinion, 907 F.2d 158 (Fed. Cir.1990).

Defendant contends that this court lacks jurisdiction for two related reasons. First, plaintiff's claims for relief are hypothetical and therefore not ripe for review. Second, the speculative nature of plaintiff's claims makes the complaint a request for declaratory relief, which this court has no authority to grant.

### Ripeness

 The case or controversy requirement of Article III of the United States Constitution prohibits federal courts from issuing advisory opinions or deciding disputes that are not concrete and adverse. *United Pub. Workers v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947); *Muskrat v. United States,* 219 U.S. 346, 361–62, 31 S.Ct. 250, 255–56, 55 L.Ed. 246 (1911); *Hayburn's Case,* 2 U.S. (2 Dall.) 409 (1792). Although established under Article I, the Claims Court traditionally has applied the case or controversy requirement unless jurisdiction conferred by Con-

---

plaintiff claims that it has suffered at least $4 million in immediate damages.

gress demands otherwise. *American Maritime Transp., Inc. v. United States*, 18 Cl.Ct. 283, 290–91 (1989); *Tennessee Valley Authority v. United States*, 13 Cl.Ct. 692, 697–98 (1987); *Kominers v. United States*, 3 Cl.Ct. 684, 685 (1983); *Welsh v. United States*, 2 Cl.Ct. 417, 420–21 (1983); *Baskett v. United States*, 2 Cl.Ct. 356, 360 (1983).[7]

■ The ripeness doctrine stems from the Article III case or controversy requirement. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).[8] Specifically, the doctrine prohibits courts from deciding hypothetical, abstract, or contingent claims. *Buckley v. Valeo*, 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976); *Aetna,* 300 U.S. at 240, 57 S.Ct. at 463. The doctrine thus enhances the independence of the judiciary by ensuring that decisions are final and binding. *See Chicago & Southern Air Lines, Inc. v. Waterman 'S.S. Corp.*, 333 U.S. 103, 113–14, 68 S.Ct. 431, 437–38, 92 L.Ed. 568 (1948), *and cases cited therein.* Furthermore, the doctrine prevents courts from forestalling the valid exercise of executive and legislative discretion. *Chicago & Southern,* 333 U.S. at 113, 68 S.Ct. at 437; *United Pub. Workers,* 330 U.S. at 90–91, 67 S.Ct. at 564–65.

The ripeness doctrine also facilitates the judicial decision making process. Specifically, the ripeness doctrine helps ensure that cases reach courts when the facts are sufficiently tangible and concrete to effect an accurate result. *See Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

■ To determine ripeness, the Supreme Court traditionally has evaluated three factors. A court must first decide the concreteness of plaintiff's alleged injury. Only concrete disputes are ripe for review. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Aetna*, 300 U.S. at 241, 57 S.Ct. at 464; *New Jersey v. Sargent*, 269 U.S. 328, 331–34, 46 S.Ct. 122, 122–24, 70 L.Ed. 289 (1926). No precise mathematical formula distinguishes concrete from hypothetical disputes. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979). As a consequence, the court necessarily must review the totality of circumstances surrounding a dispute.

The second test for ripeness requires a court to determine the likelihood of injury. *Poe v. Ullman*, 367 U.S. 497, 509, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961). A case is ripe for review only if plaintiff faces a realistic danger of sustaining direct injury. *Babbitt,* 442 U.S. at 298, 99 S.Ct. at 2308. Consequently, this court would lack jurisdiction if the future effect of Government action is uncertain. *Metzenbaum v. Federal Energy Regulatory Comm'n*, 675 F.2d 1282, 1289–90 (D.C.Cir.1982).

The third ripeness criterion evaluates the immediacy of any potential injury. *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). A case is ripe for review where plaintiff alleges actual or imminent threat of harm. *United Pub. Workers,* 330 U.S. at 89–90, 67 S.Ct. at 564–65.

*Counts One and Two: Defective Specifications*

■ Counts One and Two of plaintiff's

---

**7.** While on the Claims Court, Judge Mayer reasoned:

> Except where legislation specifically permits, such as in congressional reference cases ... this court is no freer to make advisory rulings than any other. Congress has specified that judgments of this court be reviewed in the United States Court of Appeals for the Federal Circuit and the Supreme Court of the United States ... neither of which under Article III of the Constitution would be able to confirm the advice or reject it.

*Welsh v. United States,* 2 Cl.Ct. 417, 420 (1983).

**8.** The Supreme Court has suggested that the ripeness doctrine encompasses both constitutional and prudential considerations. *Buckley v. Valeo,* 424 U.S. 1, 114, 117, 96 S.Ct. 612, 680, 681, 46 L.Ed.2d 659 (1976). Certainty of injury is a constitutional limitation, while determining the adequacy of facts for judicial resolution is a prudential consideration. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138–48, 95 S.Ct. 335, 355–61, 42 L.Ed.2d 320 (1974).

complaint basically allege the same harm.[9] According to plaintiff, FRA warranted the accuracy of its specifications but in fact supplied defective plans. Thus, FRA allegedly breached its agreement with plaintiff.

These two counts of plaintiff's complaint are ripe for review. Plaintiff alleges concrete and immediate injury. Plaintiff contends that defects in FRA's design caused it to incur approximately $4 million in delay costs. Plaintiff has allegedly paid subcontractors $3 million for change orders. Plaintiff also contends that the delays caused a loss of income and increased utility expenses.

Defendant contends that plaintiff's $4 million in costs and losses relates to the local projects which plaintiff must completely fund. Therefore, defendant disclaims any liability for the $4 million in damages. Plaintiff counters that FRA's defective designs increased the cost of the local projects.

Defendant's objection goes to the merits of the case rather than to this court's jurisdiction to entertain the suit. Indeed defendant's argument asks this court to take jurisdiction to ascertain whether the contract assigns exclusively to plaintiff responsibility for cost overruns on local projects. This contention does not attack, but presupposes, this court's jurisdiction to construe the contract.

■ Moreover, plaintiff nonfrivolously contends that its harm relates to FRA obligations under the agreement. Construing the facts as presented by plaintiff, this court finds an arguable claim. *Ralston Steel Corp. v. United States*, 169 Ct.Cl. 119, 340 F.2d 663, *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). Plaintiff presented documentary evidence and affidavits to support its claim that

FRA has some liability under the contracts for cost overruns on local projects. Plaintiff offered legal arguments to support its claim. This showing may not result in a judgment for plaintiff, but states an arguable claim.

In sum, then, Counts One and Two are ripe for review. The court therefore has jurisdiction to resolve defendant's motion for summary judgment on the warranties issue.[10]

*Count Three: Insurance Endorsements*

■ Plaintiff alleges that FRA did not secure endorsements on the liability insurance policies held by the design consultants. By this action, FRA purportedly breached its agreement with plaintiff.

Count Three seeks relief for a hypothetical and abstract injury. Plaintiff has filed a lawsuit in Massachusetts State Court against FRA's architectural and engineering consultants. The lawsuit still is underway. Plaintiff will not suffer injury from FRA's failure to secure endorsements unless the consultants, in the event plaintiff prevails, lack professional liability insurance sufficient to cover the judgment. Thus, this claim is not definite and concrete until resolution of the Massachusetts litigation.

At oral argument, however, plaintiff contended that it has already incurred attorney fees. *See, e.g.,* Transcript of Proceedings, filed July 5, 1990 (Tr.), at 48–49. According to plaintiff, the designers' insurance should pay for these legal fees. Plaintiff's complaint, however, admits that only a finding of negligence triggers insurance coverage. The complaint characterized FRA's contractual duty as an obligation "to secure from its consultant architects-engineers endorsements to the benefit

---

**9.** Count One alleges that the Government "prepared and provided the MBTA [Massachusetts Bay Transit Authority] with deficient, incomplete and otherwise inadequate and defective plans and specifications...." Complaint, No. 283–89C, filed May 18, 1989 (Complaint), at ¶ 29. Count Two alleges that FRA "expressly and/or impliedly warranted ... that the plans and specifications ... would be proper and sufficient ... would be free from errors ... and otherwise appropriate for construction of the

improvements," but that "the plans and specifications ... were not as warranted." Complaint, at ¶¶ 32, 33.

**10.** This court grants defendant's motion for summary judgment for the reasons discussed *infra*. Thus, while the court has jurisdiction over Counts One and Two, it dismisses them on the merits.

of MBTA on the professional liability insurance policies of such architects-engineers with respect to any ... acts of negligence...." Complaint, Civ.Act. No. 283–89C, filed May 18, 1989, at ¶ 36. Thus, FRA's duty only extended to insurance for "acts of negligence." Until negligence is shown, the insurance policies owe nothing to FRA or plaintiff for legal fees or otherwise.

FRA did not agree to obtain an insurance policy in plaintiff's name covering plaintiff's litigation expenses. Instead, FRA's obligation involves obtaining endorsements on policies which will not cover plaintiff's expenses until the insured is deemed negligent. Therefore, until negligence is determined, plaintiff's claim is hypothetical.

Further, the likelihood of injury remains uncertain. This court cannot determine the future effect of FRA's failure to secure endorsements until resolution of the state court litigation. Moreover, this potential future injury is distant. Discovery in the Massachusetts state action is not even near completion.

In sum, this court lacks jurisdiction over Count Three. As a consequence, the court must dismiss without prejudice this count of plaintiff's complaint. The court also must deny plaintiff's motion for summary judgment on the insurance endorsements issue.

### Count Four: Contractor Claims and Proposed Change Orders

 Under the agreements, plaintiff could not issue change orders or deviate from the design documents without FRA's approval. Further, both parties agreed that they would attempt promptly to determine their respective shares of change order costs. Plaintiff alleges that FRA breached the agreement by withholding consent unreasonably on proposed change orders. Further, plaintiff contends that FRA did not pay its share of the contractor claims caused by design defects.

The claim embodied in Count Four is ripe in relation to change orders for which plaintiff already has paid. Plaintiff alleges that it already has incurred approximately $4 million in change orders and related costs.[11] Thus, as to the $4 million in damages, four issues are ripe for resolution. First, is FRA liable under the agreement for unreasonably withholding consent on changes proposed by plaintiff? Second, did FRA in fact unreasonably withhold consent? Third, did FRA's failure to consent cause plaintiff to incur the cost of these change orders? Fourth, did plaintiff suffer $4 million in damages?

Aspects of Count Four that deal with the delay claim of White against plaintiff, however, are not ripe for review. Plaintiff presently is considering the White delay claim through its own administrative process. In fact, plaintiff asked White to resubmit a more definite statement of its claim. White only recently made this submission. Internal resolution of this claim by plaintiff may take up to one year. Thus, injury stemming from the White delay claim is hypothetical or abstract, at this point, and therefore not within this court's jurisdiction.

### Count Five: Improvements and Other Costs

 Plaintiff contends that FRA agreed to pay for claims arising from circumstances beyond plaintiff's control. FRA purportedly breached this agreement. This allegation raises a hypothetical or abstract harm. Specifically, plaintiff has not identified what it has spent, if anything, on improvements. Without definitive injury, plaintiff's claim effectively asks this court to render an advisory opinion.

Moreover, plaintiff's allegations regarding contractor claims are not ripe for review. The contractor claims are hypothetical and abstract. Specifically, until plaintiff resolves the White delay claim through its own internal procedures, this court cannot determine how much damage, if any,

---

**11.** Defendant contends that plaintiff's allegations regarding damages are not arguable and that this court therefore should dismiss the complaint. However, plaintiff demonstrated at oral argument that its allegations are arguable and therefore confer jurisdiction on this court. *See, e.g.,* Transcript of Proceedings, filed July 5, 1990 (Tr.), at 36–37, 56–57.

plaintiff will suffer. Further, plaintiff has not alleged that it paid any other contractor claim.

Plaintiff has stated a ripe claim, however, as to FRA's obligation to pay for change orders. Plaintiff contends that it already has paid approximately $3 million for changes and has suffered an additional $1 million in losses. Thus, this court has jurisdiction to resolve the issues underlying plaintiff's change orders claim: Was FRA responsible to pay for change orders prompted by circumstances beyond plaintiff's control? If FRA is responsible, what damages are due?

*Count Six: Government Pursuit of Its Contract Rights*

■ FRA did not demand that its design consultants correct defects in the specifications. Plaintiff contends that this omission breached the agreement. Plaintiff further alleges that this breach proximately caused cost overruns.

Count Six is ripe for review, but only insofar as it does not involve the White delay claim. Count Six alleges concrete, existing harm due to FRA's failure to pursue its rights against the design architects and engineers. According to plaintiff, FRA's inaction caused plaintiff to rely on defective specifications. This reliance caused delays, unanticipated change orders, and other costs which plaintiff already has paid to contractors.

In sum, then, this court has jurisdiction to address plaintiff's claim that FRA did not demand correction of the defective specifications. The court ultimately will have to resolve three issues. First, did

FRA agree to pursue its rights concerning specification defects? Second, did FRA refuse to meet its obligation? Third, if FRA did not meet its obligation, what damages did plaintiff suffer?

*Count Seven: Indemnification for Amtrak Delay*

■ Under the agreement, FRA promised to indemnify plaintiff for any contractor claims stemming from Amtrak's delays. Amtrak had to remove tracks to make way for construction at the station. According to plaintiff, Amtrak did not remove the track on schedule. Thus, Amtrak allegedly delayed plaintiff.

Count Seven is ripe for review. This count is independent of the White delay claim. Plaintiff already has paid money to remove the track. Tr., at 35. Consequently, it has suffered concrete injury. Thus, the court has jurisdiction over the Amtrak indemnification issue. However, White's claim for Amtrak delay is still not ripe at this point.

*Ripeness: Summary*

Count Three raises premature and abstract injuries which are not ripe for review. Count Three depends on the outcome of proceedings against architectural and engineering consultants in the Massachusetts court system.

■ Counts One, Two, Four, Five, Six, and Seven are ripe for review, but not in their entirety. Specifically, each is within the jurisdiction of this court only to the extent that plaintiff has already suffered injury. Thus, this court only partially grants defendant's motion to dismiss for lack of subject matter jurisdiction.[12]

---

**12.** As evidenced by the foregoing section on ripeness, this is the paradigm case of piecemeal litigation. As plaintiff explained at oral argument, it instituted suit at this juncture to avoid a future statute of limitations challenge. Plaintiff's concern, however, was unfounded in view of the modern definition of cause of action.

Since enactment of the Federal Rules of Civil Procedure in 1937, federal courts have interpreted a "claim" or "cause of action" broadly. Fed. R.Civ.P. 13 expanded the definition of claim to cover "transaction" as well as "occurrence." 3 MOORE'S FEDERAL PRACTICE ¶ 13.03, 13.13 (2d ed. 1989). This change intentionally broadened the scope of a "claim."

Practitioners and courts may read the "transaction or occurrence" language flexibly to avoid a fixed definition of "claim." *Id.* at ¶ 13.13. The "transactional approach," which the majority of federal courts follow, dictates that a claim "should be seen to embrace all the remedial rights of the plaintiff against the defendant growing out of the relevant transaction." 1 RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1980). Thus, plaintiff could have waited until ripening of the White delay claim to file this action without facing a statute of limitations problem.

### Declaratory Relief[13]

■ The Tucker Act confers important jurisdiction on this court:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1988). The Claims Court only may exercise this jurisdiction over money judgment claims. *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 952–53, 47 L.Ed.2d 114 (1976); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1008–09 (1967). As a consequence, this court lacks authority to grant requests for declaratory judgment. *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *Austin v. United States*, 206 Ct.Cl. 719, 723, *cert. denied*, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975).

■ Declaratory relief does not require a showing of existing harm or injury. The Senate Report to the Declaratory Judgment Act states:

The declaratory judgment action differs in no essential respect from any other judgment except that it is not followed by a decree for damages ... or other immediately coercive decree.

S.REP. NO. 1005, 73d Cong., 2d Sess. 2 (1934). The purpose of such a judgment is to provide "preventative relief." H.REP. NO. 1264, 73d Cong., 2d Sess. 2 (1934). Thus, to state a money judgment claim rather than merely a request for declaratory relief, plaintiff naturally will endeavor

to show that it already has suffered financial detriment.

Actual financial detriment has proven to be an effective touchstone for determining whether a complaint asks for declaratory relief. *See, e.g., St. Johns Oil Co. v. United States*, 12 Cl.Ct. 139, 142 (1987); *Husky Oil NPR Operations, Inc. v. United States*, 9 Cl.Ct. 153, 156 (1985). Under this standard, allegations regarding the White delay claim and the Massachusetts State Court litigation are requests for declaratory judgment.

In Counts One, Two, Four, Five, Six, and Seven, plaintiff partly alleges that the White delay claim resulted from FRA's acts and will cause damage. However, plaintiff has not yet suffered actual financial damage from the White claim. Plaintiff has not granted White's claim. White only recently submitted its final and official claim to plaintiff. Thus, finding for plaintiff as to the White delay claim merely would constitute a premature declaration of rights.

In Count Three, plaintiff alleges harm in connection with pending litigation it filed in state court against architectural engineering consultants. Specifically, FRA's failure to secure endorsements on the consultants' professional liability insurance policies may jeopardize plaintiff's recovery against the engineers.

These allegations, which hinge on resolution of the state court litigation are also requests for declaratory judgment. Plaintiff will not suffer harm unless the Massachusetts State Court awards judgment and the consultants are unable to satisfy the award. Thus, this court lacks jurisdiction over allegations hinging on resolution of the White delay claim as well as the Massachusetts State Court litigation. As a consequence, the court must deny plaintiff's

---

13. The court's resolution of the declaratory relief issue results in dismissal of the same aspects of plaintiff's complaint as discussed in the ripeness section, *supra*. The court nevertheless addresses declaratory relief as well as ripeness because the issues are independently significant. Specifically, a case could be ripe for review but still call for a declaratory judgment. A request for declaratory relief still must satisfy the case and controversy aspects of the ripeness doctrine. *See Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Defendant properly raised these issues as alternative bases for decision.

motion for summary judgment as to Count Three.

### Summary Judgment

██ Defendant has moved for summary judgment under RUSCC 56 as to plaintiff's breach of warranty claim in Count Two. The court may grant summary judgment where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987).

██ Summary judgment serves the salutary procedure of avoiding "unnecessary expense to the parties and wasteful utilization of ... judicial resources." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir. 1984). This court, however, must exercise great care in reviewing motions for summary judgment. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 891 (Fed.Cir. 1983). Specifically, this court must resolve all factual disputes against the movant. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

### Breach of Warranty

██ Where a contract is unambiguous on its face, that writing controls and constitutes the only source of the parties' intentions. *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722 (1970); *Keco Indus., Inc. v. United States,* 176 Ct.Cl. 983, 990–91, 364 F.2d 838, 842–43 (1966), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967); *Hotpoint, Inc. v. United States,* 127 Ct.Cl. 402, 406, 117 F.Supp. 572 *cert. denied,* 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 647 (1954). In *Perry & Wallis,* the Court of Claims explained:

> Where a contract is not ambiguous, the wording of the contract controls its meaning and resort cannot be had to extraneous circumstances or subjective interpretations to determine such meaning.

*Perry & Wallis,* 427 F.2d at 725; *accord, Hotpoint, Inc.,* 127 Ct.Cl. at 406, 117 F.Supp. 572.

██ The Government does not impliedly or expressly warrant the accuracy of its specifications in the face of an unambiguous disclaimer in the contract. *Webco Lumber, Inc. v. United States,* 230 Ct.Cl. 457, 462, 677 F.2d 860, 863 (1982); *Gross v. United States,* 174 Ct.Cl. 994, 1000–01, 357 F.2d 368, 371 (1966). In *Webco,* for example, the Court of Claims held:

> Here the government "expressly disclaimed" "any warrant as to ... quantity or quality...." The disclaimer is explicit and unambiguous, and there is no need for extrinsic evidence about its meaning.

*Webco,* 677 F.2d at 864. Thus, where the contract unequivocally disclaims warranties, such language controls the potential liability of the Government.

██ FRA unambiguously disclaimed all express and implied warranties in § 222(a) of its construction agreement with plaintiff. The operative language states:

> Title to the Project Design Documents shall pass to MBTA upon acceptance by MBTA. MBTA acknowledges that the Project Design Documents are being prepared by an A–E [Architect–engineer] as a contractor to FRA, not as FRA's agent. FRA makes no warranties, express or implied, concerning the Project Design Documents. No FRA or MBTA approval given under this Agreement shall be construed as a warranty of any kind.

Def.Br., App., at 59.

Plaintiff contends, however, that FRA cannot rely on the disclaimer because it breached a mutually dependent promise. Specifically, FRA failed to secure endorsements on the consultants' professional liability insurance in accordance with § 222(c) of the agreement. Plaintiff relies on the location of these provisions within the same section as well as extrinsic evidence of negotiations between the parties to prove that the provisions operate in tandem.

The language of § 222(a) controls. The unambiguous character of the language means that the court cannot resort to the subjective interpretation or extrinsic evi-

dence presented by plaintiff. As a matter of law, plaintiff cannot prevail on its breach of warranty claim.

■ Even if this court looked beyond the language of the contract and accepted plaintiff's contention that §§ 222(a) and (c) are mutually dependent, defendant still would prevail. A warranty does not germinate because the Government fails to secure endorsements under subsection (c). Section 604 of the agreement sets forth plaintiff's rights in the event of a breach of § 222(c) or any other contract provision. Specifically, plaintiff must notify FRA of the breach, and if not corrected, may terminate the contract and seek breach damages. Section 604, however, does not authorize plaintiff to shift risks unilaterally in the event of breach.

Even the contract law cited by plaintiff regarding mutually dependent promises fails to support a warranty claim. In the first place, the case law cited by plaintiff excuses a party from performance where breach of a mutually dependent promise results in failure of consideration. *See Staszak v. Romanik*, 690 F.2d 578, 584 (6th Cir.1982). This agreement, however, does not lack consideration. Plaintiff continued to receive and accept grant funds. Further, while the case law allows plaintiff to excuse itself from performance, it does not allow plaintiff to convert the Government's obligations unilaterally by creating a warranty. This court therefore grants defendant's motion for summary judgment as to Count Two.[14]

### *Defective Building Survey*

■ At one point during the oral argument, plaintiff explained that its complaint contains two distinct components. First, the complaint raises an issue about how to allocate cost. Specifically, the project has suffered delay and cost overruns. This problem necessarily requires a review of the risk-shifting devices of the contract to ascertain how the parties are to bear unexpected costs. Second, plaintiff contends that apart from the allocation question, FRA did not conduct a contemporary building survey, which caused MBTA costs to rise. Thus, while MBTA may have been responsible for shouldering 100% of certain types of costs, it should not have to absorb additional costs caused by an improperly conducted survey. *See supra* note 6.

The second component of plaintiff's complaint—damage attributable to a defective survey—creates a connection between this court's ripeness and breach of warranty inquiries. This approach to plaintiff's claims certainly avoids ripeness concerns. Damage occurred the minute FRA supplied designs which were based upon the defective survey. However, basing the claims on a defective survey does not avoid the summary judgment problem. The survey was merely a step in the design phase of the project. Section 222(a) explicitly disclaims any warranties pertaining to the design documents. FRA approval of the survey, if any, similarly cannot constitute a warranty under § 222(a). Consequently, plaintiff cannot escape this court's ripeness and warranty determinations by characterizing its claim as a dispute about the building survey.[15]

### CONCLUSION

Count Three is not ripe for review in its entirety because it raises premature and abstract injuries. Counts One, Two, Four, Five, Six, and Seven are ripe for review, but only insofar as they raise injuries re-

---

**14.** Insofar as Count One is the same as Count Two, allegations contained in Count One also will not be the subject of further proceedings before this court.

**15.** The fact that this court has rejected plaintiff's building survey and warranty claims does not "gut" MBTA's cause of action. Putting aside ripeness concerns, much remains for consideration. Plaintiff's Brief, No. 283–89C, filed March 19, 1990 (Pl.Br.), is replete with contractual dis-

putes. For example, the parties do not agree on who should pay for the temporary trackhead structure and walkways. Plaintiff claims that FRA should have paid for this change order because it was necessary for the station to remain open and operational. Similarly, the parties disagree as to whether the sprinkler system and headhouse floors are local improvements payable by MBTA or safety hazards to be repaired at the cost of the FRA. *See* Pl.Br., at 4–6.

sulting from the change orders already issued and paid for by plaintiff.

Allegations hinging either on the White delay claim or on plaintiff's lawsuits against consultants in Massachusetts State Court recite a claim for declaratory relief. These allegations are not ripe for review. Consequently, this court partially grants defendant's motion to dismiss for lack of subject matter jurisdiction. Because Count Three is not ripe for review and requests declaratory relief, the court also must deny plaintiff's motion for summary judgment.

The agreement at issue contains an unambiguous disclaimer of all warranties by FRA. Thus, this court grants defendant's motion for summary judgment as to Count Two. Count One is not the subject of further proceedings insofar as the allegations contained therein mirror Count Two.

At oral argument, both parties lamented the piecemeal nature of the litigation and hoped that the court could solve the problem. The court also wants to keep this entire "circus" under one tent. Plaintiff expressed willingness to suspend proceedings pending resolution of the White delay issue. Tr., at 54–56. Thus, this court suspends proceedings until MBTA grants or denies White's delay claim. Plaintiff shall file a status report on the third Friday of each month apprising the court of the progress of the White claim. Further, on or before August 15, 1990, the parties shall file a joint status report stating the issues pending for resolution.